UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MAERSK OIL TRADING PANAMA S.A. and
MAERSK LINE A/S

        Plaintiffs,

-against-

GLENCORE LTD.,

        Defendant.

21-cv-_____

**COMPLAINT**

Plaintiffs Maersk Oil Trading Panama S.A. ("MOT Panama") and Maersk A/S (formerly Maersk Line A/S ("MLAS")[1] and, collectively with MOT Panama, "Maersk"), by their attorneys Freehill, Hogan & Mahar LLP, as and for their Complaint against Defendant Glencore Ltd. ("Glencore"), alleges as follows:

## GENERAL NATURE OF THE CLAIM

1. This is an action involving, *inter alia*, a claim for damages relating to a 2018 transaction involving approximately 24,000 barrels of high sulfur marine fuel oil supplied by Glencore for use on ocean-going vessels.

## THE PARTIES

2. At all material times hereto, MOT Panama was and still is a corporate entity duly organized and existing under the laws of Panama with an office and place of business at 450 Lexington Avenue, New York, New York 10017.

3. At all material times hereto, MLAS was and still is a corporate entity organized and existing under the laws of Denmark with an office and place of business at 1263, København

---

[1] On 16 November 2019, Maersk Line A/S changed its name to Maersk A/S.

K, Hovedstaden Denmark. At all material times hereto, MLAS was the disponent owner of the *Sofie Maersk* and the time charterer of the *Maersk Aras*.

4. At all material times hereto, Glencore was and still is a corporate entity duly organized and existing under the laws of Switzerland with an office and place of business at 330 Madison Avenue, New York, New York 10017.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1333 as this action involves admiralty and maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and insofar as this action involves claims arising out of breach of a maritime contract by Glencore and maritime torts committed by Glencore.

6. Glencore is subject to personal jurisdiction in this District because Glencore maintains its principal place of business in this District.

7. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Glencore has its principal place of business in this District and is therefore a resident of this District.

## BACKGROUND FACTS

8. On 6 February 2018, Max Hendrickson of MOT and Dominic DeMattia of Glencore engaged in a chat/text exchange pursuant to which it was agreed that MOT and Glencore would swap approximately 24,000 MT of RMK 700 bunker fuel at the port of Balboa, Panama (the "Swap Deal").

9. The Swap Deal was later confirmed in an email recap sent by Hendrickson of MOT to DeMattia of Glencore on 7 February 2018 at 11:06 am (the "Email Recap").

10. The Email Recap does not incorporate or reference any standard contractual terms and conditions of either Glencore or Maersk or of any other third party.

11. Pursuant to the Email Recap, Glencore was required to supply to MOT Panama 24,000 bbls of RMK 700 HSFO to be delivered at FOB PATSA Panama on 7-10 February 2018. Likewise, MOT Panama was required to supply to Glencore 24,000 bbls of RMK 700 HSFO to be delivered via "Tank Transfer Melones" on 9-14 February 2018. RMK 700 refers to a specific standard quality of marine fuel set by the ISO.

12. The parties engaged in no discussions during the negotiation of either the Swap Deal or the Email Recap with respect to the issue of whether Glencore (or Maersk) would ultimately be liable for any consequential damages suffered by Maersk in the event of a breach. Specifically, it was never agreed that Glencore would not be liable for any consequential damages suffered by Maersk nor that Maersk would not be liable for any consequential damages suffered by Glencore as part of the "swap."

13. MOT Panama was acting as agent for MLAS in entering into the Swap Deal with Glencore, and Glencore knew that any fuel procured by MOT Panama would ultimately be supplied to vessels owned and/or operated by MLAS.

14. On 8 February 2018, Glencore delivered the approximately 24,000 bbls of bunkers to MOT Panama from PATSA Terminal Tank TK 171 (the "Fuel"). The Fuel was delivered by Glencore into the Maersk chartered bunker barge *Kollum*. Thereafter, the Fuel was transferred from the *Kollum* to the *Maersk Aras* and *Sofie Maersk*.

**THE VESSELS BURN THE FUEL**

15. The *Maersk Aras* began burning the Fuel on February 15, 2018, and suffered a complete engine failure two days later on February 17. The *Maersk Aras* had to divert to Manzanillo, Mexico, where she was required to take on an additional 1,100 bbls of replacement fuel in order to continue to trade.

16. Similarly, two weeks later, the *Sofie Maersk* began burning the Fuel on March 1. The *Sofie Maersk* almost immediately experienced fuel pump issues on March 2 and then experienced a main engine failure on March 4 while underway in the middle of the Pacific Ocean. As a result of the main engine failure, the *Sofie Maersk* also had to be towed as a dead ship to Honolulu, Hawaii, for repair and provision of 2,100 mt of replacement fuel oil.

17. Both Vessels were laden with Maersk containers and engaged on Maersk's liner service at the relevant times.

18. Given that both vessels experienced strikingly similar and significant engine failure shortly after burning the Fuel provided from the exact same source by Glencore, Maersk proceeded to test the Fuel for contaminants.

19. Samples of the Fuel were taken when the Fuel was supplied to the *Maersk Aras* and the *Sofie Maersk* from the *Kollum*, including a dock manifold line displacement sample taken at the commencement of delivery of the Fuel (the "Fuel Samples"). Testing of the Fuel Samples was performed by Veritas Petroleum Services ("VPS") Testing and Inspection Inc. in Houston, USA, and Singapore as well as by VPS in the United Kingdom, the latter being attended by witnesses appointed by the parties.

20. Unsurprisingly, the results of the testing confirmed that the Fuel contained numerous contaminants such as plastic, fibres, black gum, paraffins, fatty acids, and other

components that are impermissible for marine fuels and in violation of the agreed RMK 700 quality standard set by the ISO.

### MAERSK SUFFERS DAMAGES AS A RESULT OF THE FUEL

21. As a result of the fact that the Vessel burned the off-spec Fuel provided by Glencore, Maersk began to suffer considerable damages.

22. With respect to the *Maersk Aras*, Maersk has suffered damages in the total amount of **$1,899,552.01**, which figure is comprised of the following sub-totals:

   a. $617,153.34: Repair Costs, including spare parts and additional expenses incurred when repairing the *Maersk Aras* in Manzanillo.

   b. $1,282,398.67: Additional losses and expenses inclusive of the cost of replacement fuel, cargo damage claims, surveyor fees, and lab tests.

   c. Of the amounts set forth above, the sum of $429,951.70 was paid to the Owners of *Maersk Aras* in settlement of their claims against Maersk and $1,459,600.31 represents Maersk's own losses.

23. Likewise, with respect to the *Sofie Maersk*, Maersk has suffered damages in the total amount of **$4,196,724.72**, which figure is comprised of the following sub-totals:

   a. $2,829,414.17: Repair Costs, including spare parts, the costs of towing the vessel as a dead ship to Hawaii, and additional expenses incurred when repairing the *Sofie Maersk* in Hawaii.

   b. $1,367,310.55: Additional losses and expenses inclusive of the cost of replacement fuel, loss of use of the vessel, cargo damage claims, surveyor fees, and lab tests.

   c. In the case of *Sofie Maersk* the figures above represent Maersk's own losses.

24. Taking into account the damages suffered with respect to both the Maersk Aras and the Sofie Maersk, the total amount of damages suffered by Maersk as can best be calculated at this time equals **$6,096,276.73**.

### MLAS' OBLIGATIONS WITH RESPECT TO THE *SOFIE MAERSK*

25. MLAS is and was at all relevant times hereto the bareboat charterer of the *Sofie Maersk*. The *Sofie Maersk* is owned by Taida International Ship Lease Co. Ltd. ("Taida"). MLAS bareboat chartered the *Sofie Maersk* via a bareboat charter party dated in 2017 between MLAS, as Charterers, and Taida, as Owners (the "Sofie Maersk C/P").

26. Pursuant to Clause 10 of the Sofie Maersk C/P, MLAS was required to perform all repair and maintenance to the *Sofie Maersk* during the term of the Sofie Maersk C/P at MLAS' sole cost and expense.

27. In addition, Clause 10 of the Sofie Maersk C/P further provided that the *Sofie Maersk* "shall be in the full possession and at the absolute disposal for all purposes of the Charterers and under their complete control in every respect."

28. MLAS thus maintained actual and control possession of the *Sofie Maersk*, as well as complete responsibility for maintenance and repair to the vessel.

### MLAS' OBLIGATIONS WITH RESPECT TO THE *MAERSK ARAS*

29. MLAS was the time charterer of *Maersk Aras* and, under the terms of the time charterparty, responsible for supplying *Maersk Aras* with bunkers and liable to the Owners of *Maersk Aras* for any damages and/or loss caused as a result of the supply of off-spec and/or unsuitable bunkers. MLAS had, thus, to settle the claim by the Owners and are, given that the supply of bunkers was, under the terms of the charterparty with the Owners of *Maersk Aras*, the responsibility of MLAS, unable to claim their losses from the Owners of *Maersk Aras.*

30. MLAS settled the claim presented by the Owners of *Maersk Aras* ("the Settlement Agreement"). As part of the Settlement Agreement, the Owners of *Maersk Aras* agreed "*to execute a future assignment to* [MLAS] *or their nominee of any and all claims that Owners may have against any party arising out of or connected to the Supply* [as defined in the Settlement Agreement]*, in such form as stipulated by Charterers*".

31. The Owners of *Maersk Aras* have assigned all their claims to MLAS. MLAS now stands in the shoes of the Owners of the *Maersk Aras* and thus is permitted to advance all claims the Owners of the *Maersk Aras* could advance against Glencore.

32. Glencore previously filed a declaratory judgment action in New York Supreme Court concerning the subject matter of this action, in which Glencore has sought a declaration that it is not liable to either MOT Panama or MLAS under the contract, in tort or otherwise arising out of the subject fuel transaction. *Glencore Ltd. v. Maersk Oil Trading Panama S.A., et al.*, Index No. 655121/2019 (N.Y. Sup. Ct. 2019). Despite the fact that the claims asserted by Maersk herein are effectively the mirror image of the declaratory judgment claims brought by Glencore in the state court action, Glencore stated that it would oppose a motion by Maersk to amend its answer to assert affirmative counterclaims in that case. Maersk disagrees with Glencore's position and filed a motion for leave to amend on January 29, 2021.

### AS AND FOR A FIRST CAUSE OF ACTION BY MOT PANAMA AND MLAS FOR BREACH OF CONTRACT

33. Plaintiffs MLAS and MOT Panama repeat and re-allege each and every allegation as set forth in paragraphs 1-32 of the Complaint with the same force and effect as if fully set forth herein.

34. MOT Panama was acting as agent for MLAS in entering into both the Swap Deal and the Email Recap. MOT Panama's role was to procure fuel for use by MLAS owned or operated vessels. As such, both MOT Panama and MLAS are parties to the Swap Deal and Email Recap.

35. Glencore knew that the Fuel provided as part of the Swap Deal would ultimately be used on vessels owned and/or operated by MLAS such as the *Maersk Aras* and *Sofie Maersk* because at that time it was well-known in the market that MOT Panama only sourced bunkers for MLAS vessels and that the *Kollum* was in effect an exclusive floating bunkering station for MLAS owned or operated container vessels.

36. Pursuant to the Swap Deal and Email Recap, Glencore was required to provide fuel that was suitable for use of ocean-going vessels such as the *Maersk Aras* and *Sofie Maersk*.

37. However, the Fuel provided by Glencore was not suitable for use on ocean-going vessels as it contained a number of deleterious substances such as plastic, fibres, black gum, paraffins, fatty acids, and other components that are impermissible for marine fuels and in violation of the agreed RMK 700 quality standard set by the ISO.

38. This is evident given that shortly after both of the Vessels began to burn the Fuel they experienced striking similar and significant engine issues, with the *Maersk Aras* being forced to divert to Mexico and the *Sofie Maersk* having to be towed as a dead ship to Hawaii for repairs.

39. As a result of Glencore's breach, Maersk has suffered considerable damages in the form of repair costs and other additional losses and expenses arising out of the Vessels' respective attempts to burn the off-spec Fuel and accompanying engine failures. Such damages currently total **$6,096,276.73**.

40. As a consequence of the aforesaid breach, Glencore is liable to Maersk for all damages and losses occasioned by the breach, including but not limited to repair costs, replacement costs, towage expenses, the cost of replacement fuel, cargo damage claims, surveyor fees, and lab testing in an amount currently totaling **$6,096,276.73** with the exact amount to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
## BY MLAS FOR PRODUCTS LIABILITY IN TORT

41. Plaintiff MLAS repeats and re-alleges each and every allegation as set forth in paragraphs 1 – 32 of this Complaint with the same force and effect as if fully set forth herein.

42. All tort claims advanced by MLAS against Glencore are governed by maritime jurisdiction. First, the provision of off-spec fuel to the Vessels took place on navigable waters. Second, the general type of incident involved (i.e. the provision of off-spec fuel) has a potentially disruptive effect on maritime commerce because, as is evident given the facts of this case, vessels supplied with off-spec fuel are frequently forced to deviate from their planned trade. Third, the general character of the activity giving rise to the incident bears a substantial relationship to the bunkering of vessels, which is unquestionably a traditional maritime activity.

43. Glencore provided the Fuel to both the *Maersk Aras* and the *Sofie Maersk* by way of the Swap Deal.

44. At the time the Fuel was provided by Glencore to MLAS it was in a defective condition. Specifically, as was confirmed by engine failures on both Vessels caused by the fuel and also as later confirmed by testing, the Fuel contained numerous contaminants such as plastic, fibres, black gum, paraffins, fatty acids, and other components that are impermissible for marine fuels and in violation of the applicable RMK 700 quality standard set by the ISO.

45. The Fuel resulted in injury to MLAS because it caused damage to both the Vessels, which in turn caused MLAS to suffer additional damages in the form of repair costs plus additional losses and expenses flowing from such damage.

46. MLAS suffered direct physical damage to the Vessels, which both experienced major engine failure shortly after burning the Fuel, as well as significant additional losses flowing from such damage.

47. As a plaintiff in a maritime tort action, MLAS is entitled to recover all reasonable physical and economic damages that have arisen directly as a result of the tort committed by Glencore, and an award of damages is required to place MLAS in the same position it would have been in had the tort not occurred – that is Glencore had supplied Fuel that was not defective and was suitable for use on the Vessels.

48. Accordingly, as a direct result of the foregoing, Glencore is liable to MLAS for all damages and losses occasioned by provision of the defective Fuel, including but not limited to repair costs, replacement costs, towage expenses, the cost of replacement fuel, cargo damage claims, surveyor fees, and lab testing in an amount currently totaling **$6,096,276.73** with the exact amount to be determined at trial.

**AS AND FOR A THIRD CAUSE OF ACTION
BY MLAS FOR NEGLIGENCE**

49. Plaintiff MLAS repeats and re-alleges each and every allegation as set forth in paragraphs 1 – 32 of this Complaint with the same force and effect as if fully set forth herein.

50. All tort claims advanced by MLAS against Glencore are governed by maritime jurisdiction. First, the provision of off-spec fuel to the Vessels took place on navigable waters. Second, the general type of incident involved (i.e. the provision of off-spec fuel) has a potentially disruptive effect on maritime commerce because, as is evident given the facts of this case,

vessels supplied with off-spec fuel are frequently forced to deviate from their planned trade. Third, the general character of the activity giving rise to the incident bears a substantial relationship to the bunkering of vessels, which is unquestionably a traditional maritime activity.

51. At all relevant times, Glencore held itself out to MLAS as being skilled and competent in its role as supplier and seller of fuel oil and capable of providing fuel oil to MLAS that was capable of being utilized in marine applications onboard the Vessels. Noting this was a Swap Deal and MOT/Maersk would have had the same obligations to Glencore for their supply of fuel.

52. However, Glencore failed to use reasonable and ordinary degree of skill and care to ensure the Fuel it was supplying did not contain additives or contaminants which rendered it unusable and/or unsafe for marine applications and in violation of the applicable RMK 700 quality standard set by the ISO and/or unsuitable for use on the Vessels.

53. Rather, Glencore was negligent as it failed to use and exercise reasonable care, skill and diligence in their supply of the Fuel to MLAS which resulted in the Fuel being unsafe and unusable for marine applications and/or unsuitable for use on the Vessels.

54. As a plaintiff in a maritime tort action, MLAS is entitled to recover all reasonable physical and economic damages that have arisen directly as a result of the tort committed by Glencore, and an award of damages is required to place MLAS in the same position it would have been in had the tort not occurred that is Glencore had supplied Fuel that was not defective and was suitable for use on the Vessels.

55. As a direct result of Glencore's negligence and/or gross negligence, MLAS has suffered damages in an amount currently totaling **$6,096,276.73** with the exact amount to be determined at trial.

WHEREFORE, Plaintiffs Maersk pray for a judgment against Defendant Glencore on the above causes of action in a total sum exceeding **$6,096,276.73**, as well as the costs and attorney fees to be incurred in respect to this action, plus interest, together with such other and further relief as this Court may deem just and proper in the premises.

Dated:  New York, New York
February 5, 2021

                FREEHILL HOGAN & MAHAR LLP
                *Attorneys for Maersk*

                    /s/ Don P. Murnane, Jr.
                By: _____
                Don P. Murnane, Jr. (murnane@freehill.com)
                Gina M. Venezia (venezia@freehill.com)
                Michael J. Dehart (dehart@freehill.com)
                80 Pine Street, 25th Floor
                New York, NY 10005
                Tel: 212-425-1900 | Fax: (212) 425-1901